```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION
```

_____

PETER J. MAGER,

      Plaintiff,

    v.                            File No.  2:16-cv-00145

WISCONSIN CENTRAL LIMITED,
ET AL.,

      Defendant.
_____/

VERNON BARTON,

      Plaintiff,

    v.                            File Nos. 2:16-cv-00183

WISCONSIN CENTRAL LIMITED,
ET AL.,

      Defendant.
_____/

                        Hearing

Before

        THE HONORABLE TIMOTHY P. GREELEY
          United States Magistrate Judge
             November 28, 2017

```
                         APPEARANCES

For the Plaintiffs:   James T. Foley
                      Ridge & Downes
                      101 N. Wacker Drive, Suite 200
                      Chicago, IL  60606
                      (313) 372-8282
                      jfoley@ridgedownes.com

For the Defendant:    Mary C. O'Donnell
                      Durkin McDonnell, P.C.
                      645 Griswold, Suite 3253
                      Detroit, MI  48226
                      (313) 963-3033
                      modonnell@durkinmcdonnell.com

Courtroom Deputy:     Cathy Moore

Recorded By:          Digitally recorded

Transcribed By:       Bonnie L. Rozema, CER-5571
                      (616) 878-9091
                      rozemab1@comcast.net
```

TABLE OF CONTENTS

<u>WITNESS</u>:                                                        <u>PAGE</u>

None



<u>EXHIBITS</u>:                                                       <u>IDENTIFIED</u>

None

```
 1    Marquette, Michigan
 2    Tuesday, November 28, 2017 - 1:44 p.m.
 3              THE CLERK:  The court calls the case of Peter
 4    Mager and Vernor -- Vernon Barton versus Wisconsin Central
 5    Limited, case numbers 2:16-cv-145 and 183.
 6              THE COURT:  Good afternoon.  I'd ask counsel to
 7    place their appearance on the record, please.
 8              MR. FOLEY:  Jim Foley for both parties.
 9              MS. O'DONNELL:  Mary O'Donnell, your Honor, for
10    Wisconsin Central Limited.
11              THE COURT:  This matter was set for hearing on
12    defendant's motion to dismiss as well as for a settlement
13    conference.  Mr. Foley, I issued orders in both cases in
14    September requiring confidential settlement letters.  I
15    didn't get one from you.
16              MR. FOLEY:  I sent it to counsel.  I was under
17    the impression that they had sent it to you also, your
18    Honor.
19              MS. O'DONNELL:  The order required us to send
20    them to each other and to --
21              THE COURT:  I'll give you a copy of the order I
22    issued, Mr. Foley, for you to review.  The orders are
23    identical in both cases.  This is the order I entered in
24    2:16-cv-183 on page three, subsection (c).
25              MR. FOLEY:  (Pause while reading.)  I did not --
```

1    I did not do that, your Honor.
2              THE COURT:  With respect to the IME that was
3    conducted, it's my understanding, Mr. Foley, that you had
4    or were responsible for taping that conversation, the
5    conversations; is that correct?
6              MR. FOLEY:  Correct.
7              THE COURT:  How did you do that?
8              MR. FOLEY:  With a cell phone.
9              THE COURT:  And who did you inform that you were
10   doing that?
11             MR. FOLEY:  My client and myself.
12             THE COURT:  In researching this issue, I have
13   found a number of cases where plaintiff's counsel requested
14   the right to tape conversations or tape IMEs, and in most
15   of those cases those requests were denied.  Were you aware
16   of any of those cases?
17             MR. FOLEY:  I was not, your Honor.
18             THE COURT:  Aware of any support for the
19   proposition that attorney has the right to tape record an
20   IME?
21             MR. FOLEY:  I have done it in the past and never
22   had objection, it's never been an issue.  I've researched
23   taping conversations in the State of Wisconsin, and the
24   State of Wisconsin's a one-party state.
25             THE COURT:  It would not be permitted in this

1    state.  Did you know that?
2                MR. FOLEY:  Correct.  It would not be permitted
3    in Illinois, but it is in Wisconsin.
4                THE COURT:  How was that transcribed?
5                MR. FOLEY:  The conversation was transcribed by
6    one of the administrative assistants in my office.
7                THE COURT:  Have you provided a copy of the tape
8    recording to defense counsel?
9                MR. FOLEY:  I did, your Honor.
10               THE COURT:  As a result of the failure to file
11   confidential settlement letters, the Court's not prepared
12   to go forward with that and will issue an order sanctioning
13   plaintiff's attorney for failure to comply with this
14   Court's order, will pay reasonable attorney's fees and
15   costs and travel costs for defendant's representative.
16   With respect to the conduct at the IME, I'm at a loss as to
17   how an attorney, an officer of this Court, can believe that
18   that conduct was appropriate.  It appears as if you were
19   trying to obstruct or encourage your client to not comply
20   with my order that he participate in a question and answer
21   session with the doctor's office.  I'm left with serious
22   concerns regarding your conducts, compliance with the Code
23   of Conduct in this state, and with the expectations of this
24   Court.
25               Accordingly, I will be considering whether or

1  not to refer this matter to a three judge panel of this
2  court for consideration as to whether or not you should be
3  suspended from practice in this court.  While that is under
4  consideration, I'm going to hold this case in abeyance.
5              MR. FOLEY:  Judge, for the record, can I ask
6  what it is that I did that was inappropriate?  There was no
7  obstruction that went on during the course of this IME.
8  The doctor repeatedly said that he did not need Peter Mager
9  to answer questions.  I didn't encourage him at any point
10 not to answer a question.  He answered preliminary
11 questions when we walked in the door about his address, who
12 he worked for, his marital status, his date of birth, his
13 social security number.  He gave them all that information.
14 There was an issue made about a driver's license.  He
15 refused to have them make a copy of his driver's license,
16 but at no time did anyone ever inform Peter Mager that the
17 reason that they wanted to see his driver's license was to
18 confirm his identity.  They never asked him that.
19             There was a two-page form that was attached to
20 the doctor's report that was a form that apparently was
21 produced by MES which is the company that Dr. Revord
22 provides these IMEs through or for.  They're the ones that
23 wanted a copy of the driver's license, and there's three
24 categories.  Either the plaintiff or the examinee provided
25 the driver's license, didn't have a driver's license, or

1   refused to provide the driver's license, so apparently that
2   happens all the time.
3           He's got an expectation of a right of privacy.
4   I didn't -- I didn't tell the plaintiff not to provide his
5   driver's license.  He chose not to do that.  I didn't tell
6   him not to answer any questions.  He chose not to answer a
7   question.  But all of the information that the doctors
8   sought had already been provided to them.  All of the
9   information is provided in his report, and the report was
10  authored, it was completed the same day as the IME.  He
11  said walking in that he felt like he knew Peter Mager from
12  reviewing all the documents.
13          He said as soon as he opened the door and walked
14  in, he said, "I understand you don't want to answer
15  questions, that's fine, you don't need to answer
16  questions."  Peter Mager took his clothes off, put the robe
17  on, and submitted to a thorough and complete physical
18  examination.  At no time did he ever deny the doctor an
19  opportunity to physically examine him.  And that's the
20  purpose of the IME.
21          THE COURT:  I take it you'd like to respond?
22          MS. O'DONNELL:  Yes, your Honor.
23          THE COURT:  Go ahead.
24          MS. O'DONNELL:  As I indicated in my reply, your
25  Honor, I take neither personal nor professional pleasure in

1   the situation.  As I said before, as an officer of the
2   court, I have total respect for the court system, in
3   particular court orders, and perhaps unfairly for federal
4   court orders.
5           This Court knows, and Mr. Foley knows how much
6   trouble we went through to get to the IME point.  Well, I'm
7   embarrassed to say that after your court clerk, Ms. Moore,
8   accommodated me while I was out of town and scheduled a
9   telephone conference with your Honor, I was embarrassed
10  when I was told when I first boarded the plane that I could
11  finish my conversation with you.  And even though the doors
12  hadn't closed and we hadn't pulled away, my phone was cut
13  off, and I was very embarrassed, because I was talking to a
14  federal court judge, accommodated by his clerk, Mr. Foley
15  was on the phone, I was very upset.
16          As soon as I landed in Detroit I immediately
17  called your chambers.  I felt it was inappropriate what I
18  had done, told all my conversation that I had requested, to
19  be truncated, through no fault of my own, but nevertheless.
20  And it's that perspective that I bring to this situation,
21  which is we all know what struggle we went through to get
22  that IME order.  And your Honor entered the order and it
23  was very clear, because, basically, you had given us the
24  option, Mr. Mager can either fill out a questionnaire that
25  Dr. Revord needed, or he could be interviewed.  And we went

1  back and forth.  You accommodated us, your clerk and I
2  spoke.  I said, "What was it that the judge was going to
3  ask me?"  The question was, "How long is this IME going to
4  take?"  So your Honor entered an order that the IME would
5  go forward, and it says specifically, "for an interview by
6  a physician assistant and for Dr. Revord to conduct an IME,
7  and shall not exceed three hours."  That's a federal court
8  order entered after a lot of work went into getting the
9  IME.  And yet, as indicated in Dr. Revord's report, the
10 claimant refused to provide an identification card.
11        Why is that important?  Well, unfortunately, I
12 was the recipient back in my early days representing
13 criminal defendants, I met my client once in prison, I show
14 up in court, he looked the same to me, your Honor.  It
15 turned out it was not my client, it was someone pretending
16 to be my client.  I had to answer for that because I made a
17 mistake.
18        The doctor wanted to make sure that Mr. Mager
19 was Mr. Mager when he examined someone, so he refuses his
20 identification card.  And then he refuses to answer any
21 questions regarding his medical condition saying, "It's in
22 my deposition."  As I said in my reply, this conduct was
23 not a mistake.  This conduct was intentional.  In the
24 course of arguing about the IME, why was it not raised that
25 "I want my attorney to attend?"  Why was it not raised that

1  "May I have permission, it's a one-party consent state, may
2  I have permission to record this?"  Those two issues were
3  not raised.  And throughout this report, as indicated
4  ad nauseam by me in my motion, Mr. Mager refused to answer
5  questions.
6       I was shocked when I got a call from the
7  doctor's office and was told what had happened.  I've been
8  doing this 36 years, IME issues come up, they're resolved.
9  That's what the court is here for.  And your Honor has been
10 very accommodating, we have an issue, you'll hear it,
11 either in person or over the phone.  A court order here was
12 violated because Mr. Mager refused to answer the questions
13 of the physician assistant, as indicated in the order.  The
14 conduct was intentional, your Honor has indicated it
15 suggests it was intended to obstruct, I don't think we have
16 to go that far.  The point is, the order was violated and
17 there is no question about that.
18       And I know that dismissal is a draconian
19 measure, so as I said in my motion, I thought how else
20 could we address this, strike his claim for physical
21 injuries?  Strike his claim for permanent disability?
22 Well, that's tantamount to a dismissal.  Given the amount
23 of work that went into this order, given the Court's
24 accommodation, and given what appears to be intentional
25 conduct, but again, we don't even need to go that far, it's

1        a clear violation of the order for Mr. Mager to have
2        refused to participate in the interview with the physician
3        assistant.  On that basis, for those reasons, this case
4        should be dismissed.  Thank you, your Honor.
5                    THE COURT:  Respond?
6                    MR. FOLEY:  Judge, there was no refusal to
7        answer questions on the part of Peter Mager.  There was --
8                    THE COURT:  There are a number of occasions
9        where he answered questions by saying, "The answer is in my
10       deposition."
11                   MR. FOLEY:  Correct.  Correct.
12                   THE COURT:  Did you instruct him to do that?
13                   MR. FOLEY:  I did not, your Honor.  I did not.
14       I did not.
15                   THE COURT:  Did you instruct him to answer the
16       questions?
17                   MR. FOLEY:  During the course of the
18       examination, I did not do that either.  I don't understand
19       the obligation that Peter Mager has to answer questions to
20       a doctor chosen by the railroad to perform a physical
21       examination.  What federal law requires that he answer
22       questions?
23                   THE COURT:  My order.
24                   MR. FOLEY:  Rule 35 --
25                   THE COURT:  My order.

1        MR. FOLEY:  Your order said, judge, and with all
2   due respect, we followed your order to the T.  I gave the
3   doctor's office a copy of your order immediately upon
4   walking in that office.  On --
5        THE COURT:  He was -- he was to allow himself to
6   be interviewed by the physician's assistant.
7        MR. FOLEY:  And he sat for an interview with the
8   physician's assistant.
9        THE COURT:  And didn't answer the questions.
10       MR. FOLEY:  He directed her to a copy of his
11  deposition, which he provided her.  He answered questions,
12  personal questions about his identity, his address, his
13  marital status, his employment status.  He answered all
14  those questions, and that's all in the transcript.  When --
15  when the doctor walked in, the doctor said to him, "I
16  understand you don't want to answer questions."  Peter
17  said, "Correct."  And he said, "That's okay.  You don't
18  have to answer questions."  And that's after he already
19  told Peter that he knew everything, he felt like he knew
20  him because he had reviewed a stack of materials.  The
21  doctor did not ask any additional questions throughout the
22  course of the evaluation other than, from my recollection,
23  on two occasions said, "I don't suppose you want to tell me
24  about this," and Peter said, "No, it's in my deposition."
25       At one point the doctor on his own said to Peter

1      something along the lines of, you filled out an accident
2      report and you said that your legs gave out as you walked
3      to the driver's side of the door, and yet in your complaint
4      you said you slipped on hydraulic oil in the back of the
5      truck.  That's -- if he's got that information already, why
6      would he need Peter Mager to answer questions other than
7      it's a rehash of his deposition?  Those are issues
8      regarding the injury, the liability aspects of the case.
9      The doctor is there to come up with an evaluation on his
10     current situation, to review medical records, and to come
11     up with an opinion.  He came up with an opinion.  He said
12     there's nothing wrong with him.  He wasn't obstructed in
13     any way during the course of his evaluation from
14     formulating a -- formulating an opinion about his physical
15     condition.  He had records all the way back to his school
16     health records.  He had every medical record.
17             There were 70 entries on his six-page report of
18     medical records that he reviewed.  He had his family
19     history, he had his own personal history, he had his school
20     health records, his school academic records, medical
21     records from as far back as were available, the doctor had
22     them all, and he had reviewed them before Peter ever walked
23     in.  There was no obstruction, there was no intentional
24     act.
25             I've been doing this for over 25 years and I go

| | |
|---|---|
| 1 | to every IME with my client, and the same situation |
| 2 | happens.  I didn't do anything differently on October 20th, |
| 3 | 2017, than I've done in every other IME that I've attended, |
| 4 | and I've never had an issue prior. |
| 5 |     THE COURT:  You've taped them all? |
| 6 |     MR. FOLEY:  I've taped some of them when in the |
| 7 | era of cell phone.  In Illinois you need the consent of all |
| 8 | parties, and I've gotten that and never had a doctor |
| 9 | object. |
| 10 |     THE COURT:  As I indicated, I'm going to hold |
| 11 | these cases in abeyance.  I will take from defense counsel |
| 12 | a statement as to reasonable costs and fees incurred for |
| 13 | this conference and I'll put down an order after I've come |
| 14 | to a conclusion as to how to best handle this.  We'll be |
| 15 | adjourned. |
| 16 |     (At 2:02 p.m., proceedings concluded.) |
| 17 |       -oo0oo- |

CERTIFICATE OF REPORTER

I, Bonnie L. Rozema, CER, do hereby certify that the foregoing transcript consisting of 16 pages, is a complete, true, and accurate transcript of the proceedings and testimony, to the best of my ability from the audio recording, held in this case on November 28, 2017.

I do further certify that I prepared the foregoing transcript.

/s/   Bonnie L. Rozema

Bonnie L. Rozema, CER-5571
2700 92nd Street, S.W.
Byron Center, MI  49315
(616) 878-9091

Notary Public in and for
Kent County, Michigan
My commission expires:
March 26, 2019
Acting in the County of Kent

16